Sophia M. Rios (SBN 305801)
srios@bergermontague.com
**BERGER MONTAGUE PC**
8241 La Mesa Blvd., Suite A
La Mesa, CA 91942
Telephone: (619) 489-0300

[Additional Counsel Appear on Signature Page]

*Attorneys for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT TRUSTY, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COMERICA BANK,<br><br>Defendant. | No. 5:25-cv-03318-KK-DTB<br><br>**FIRST AMENDED COMPLAINT - CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

## I.   NATURE OF ACTION

1.   While recipients of Social Security and other federal benefits often receive funds to the account of their choice, millions of senior citizens, disabled Americans, and other beneficiaries receive them through the Direct Express Debit Mastercard ("Direct Express") program. Since 2008, Defendant Comerica Bank ("Defendant" or "Comerica" or "Comerica Bank") has contracted with the U.S. Department of the Treasury's Bureau of the Fiscal Service to serve as the exclusive administrator for the Direct Express program, which makes federal benefit payments available to consumers via prepaid debit card accounts. Direct Express cardholders—including, but not limited to, older Americans receiving Social Security benefits, disabled Americans receiving Social Security disability insurance payments, and coal workers eligible for federal benefits related to black lung disease—have their benefits loaded onto the prepaid cards issued by Comerica, which they can use to pay for groceries, gas, and other expenses.

2.   Plaintiff Robert Trusty ("Plaintiff" or "Mr. Trusty") received Social Security and Supplemental Security Income on a Direct Express Debit Card in July 2025. When $681.99 was stolen from Mr. Trusty's account in a fraudulent transfer, Defendant refused to help.

3.   Comerica Bank is required by federal law to return funds taken from a consumer in unauthorized transactions.

4.   Defendant suspended Mr. Trusty's account for "suspicious activity" after the fraudulent transfer.

5.   Mr. Trusty tried to contact Defendant's customer service regarding the suspended account over the next several days—multiple times per day. Each time, he was directed to an automated answering service and put on hold. But no one picked up his calls, sometimes even after Mr. Trusty had waited twenty minutes trying to reach someone.

6.     When Mr. Trusty finally got through to a customer service representative and discovered the fraudulent transaction, he promptly reported it and disputed the charge. However, Defendant denied his claim using a form letter for "conflicting info." Defendant still has not credited any of the stolen funds back to Mr. Trusty's account.

7.     An investigation by federal authorities that culminated in a lawsuit filed by the Consumer Financial Protection Bureau ("CFPB") in December 2024 revealed that Mr. Trusty's experience with Defendant is sadly far from unusual. The CFPB found that since April 1, 2019, Comerica has impaired cardholders' ability to protect and access their funds by routinely providing deficient customer service to Direct Express cardholders. For example, Comerica's vendors intentionally terminated almost 25 million customer service calls from cardholders who were on hold before the cardholders could speak to a representative, and cardholders whose calls were not terminated have frequently been subjected to excessive wait times to speak with a representative, sometimes up to several hours.

8.     Mr. Trusty brings this action on behalf of himself and other Direct Express cardholders who reported unauthorized transactions but did not receive those funds back because Defendant determined that no fraud occurred based on Defendant's shoddy investigation practices and its failure to communicate effectively with account holders who disputed unauthorized charges.

## II.     JURISDICTION AND VENUE

9.     This Court has jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 1693m(g) because Mr. Trusty's Electronic Funds Transfer Act Claim arises under federal law.

10.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367 to resolve Mr. Trusty's claims arising under Michigan and California law for breach of contract and statutory violations.

11. This is the proper venue because a substantial part of the events or omissions giving rise to Mr. Trusty's claims occurred in this District. 28 U.S.C. § 1391(b)(2). Defendant Comerica Bank also operates numerous branches within this District.

## III.   PARTIES

12. Plaintiff Robert Trusty is a natural person domiciled in Riverside County, California.

13. Defendant Comerica Bank is a Texas state-chartered commercial bank with its corporate headquarters in Dallas, Texas.

14. Comerica is a division of Fifth Third Bank, N.A. ("Fifth Third"), one of the largest banks in the country.

15. Comerica is a "financial institution" subject to the EFTA and Regulation E because it is a national bank holding consumer deposit accounts. 15 U.S.C. § 1693a(9); 12 C.F.R. § 1005.2(i).

16. In April 2024, Comerica announced that it had lost the Direct Express contract renewal. However, Comerica still manages the program as part of a three-year transition period.

17. In September 2025, Fifth Third announced it had been designated by the Bureau of the Fiscal Service as the new financial agent for the Direct Express prepaid debit card program, with a five-year financial agency agreement beginning on September 9, 2025.

18. However, in October 2025, Fifth Third and Comerica announced that Fifth Third would acquire Comerica during a merger that will close in early 2026. The definitive merger agreement is in an all-stock transaction valued at $10.9 billion.

19. On February 2, 2026, Fifth Third announced it had closed its merger with Comerica Incorporated to create the ninth-largest U.S. bank with approximately $294 billion in assets.

20.    On the Fifth Third and Comerica websites, the banks stated that Direct Express "[c]ustomers will continue to use their Direct Express cards and services as usual. Fifth Third's appointment as Fiscal Agent ensures continuity of service, and any changes or enhancements will be communicated clearly and in advance. The transition is designed to be seamless for cardholders."[1]

**IV.    FACTUAL ALLEGATIONS**

**A.    Defendant Comerica Bank**

**1.    The Direct Express Program**

21.    In 2007, the Bureau of the Fiscal Service established the Direct Express program. Through this program, recipients of certain benefits—federal and state-disbursed Social Security and supplemental security income (SSI) for adults and children with disabilities, veterans' pension and education assistance, civil service retirement, and compensation for coal workers with black lung disease, among others—can receive their benefits on a prepaid debit card. Since 2013, with limited exceptions, non-veteran federal beneficiaries have had only two options for how to receive their benefit payments: through a Direct Express debit card or direct deposit into a bank account.

22.    Since January 2008, Comerica has had an exclusive contract with the Bureau of the Fiscal Service to administer the Direct Express program by providing the prepaid Direct Express debit card and associated account services to enrollees in the program. In exchange, the Bureau of the Fiscal Service pays Comerica a fee for every beneficiary who enrolls in the Direct Express program.

---

[1] *Fifth Third To Acquire Comerica*, FIFTH THIRD, https://www.53.com/content/fifth-third/en/mkg/bettertogether.html#:~:text=Fifth%20Third%20was%20recently%20appointed,to%20be%20seamless%20for%20cardholders (last visited March 16, 2026); Comerica to become part of Fifth Third, Comerica, https://www.comerica.com/bettertogether.html (last visited March 16, 2025).

23. Comerica announced that its contract to operate the Direct Express Program would not be renewed in April 2024, but Comerica continues to manage the Direct Express Program during a three-year transition period.

24. Comerica provides around $3 billion in benefits annually to approximately 3.5 million Direct Express cardholders.

**2.    Comerica's Failure to Provide Customer Service to Cardholders**

25. Direct Express cardholders rely on Comerica's customer service phone lines for their account services.

26. Since at least April 1, 2019, Comerica has advertised its customer service phone lines as the best way to contact Comerica Bank. In the Direct Express welcome letter and Terms of Use that Comerica sends to new cardholders, Defendant touts the fact that the phone line is available "24 Hours a Day / 7 Days a Week" to address any questions or concerns the cardholder may have.[2]

27. Before 2022, in fact, the Direct Express website and app only allowed cardholders to view their account information. All other account services had to be transacted over the phone or by mail. To avail themselves of Regulation E protections by, for instance, filing a notice of error, initiating a stop payment request, or cancelling a preauthorized transfer, cardholders had to call or write Comerica Bank.

28. By Comerica's design, the customer service phone lines are cardholders' most convenient option to access account services. The Bank will only accept Regulation E notices of error or requests to stop preauthorized payments through the phone line or the mail. Although Comerica does currently offer certain automated options on its phone line, as well as a Direct Express website and app,

---

[2] *See* Comerica, TERMS OF USE FOR YOUR DIRECT EXPRESS® DEBIT MASTERCARD® CARD, *available at* https://www.comerica.com/content/dam/comerica/en/directexpress/Terms_And_Conditions.pdf (last visited March 17, 2026).

FIRST AMENDED
COMPLAINT-CLASS ACTION
CASE NO. 5:25-CV-03318-KK-DTB

cardholders cannot use these methods to avail themselves of Regulation E's protections. They can only use the website and app for basic services like checking their account balances, ordering replacement cards, and changing their contact information.

29. Comerica steers its cardholders to its customer service lines, stating in its Terms of Use, in a section titled "Your Liability for Unauthorized Transactions," that "[t]elephoning us at the Customer Service number is the best way of keeping your possible losses down."

30. Despite Comerica's insistence that calling customer service is the "best way" to interface with it, Direct Express cardholders who call Comerica's customer service phone lines regularly endure long waits—sometimes waiting for as long as two-and-a-half hours—to speak with a customer service representative.

31. Comerica's contracts with the Bureau of the Fiscal Service and the vendors include a set of Service Level Requirements (SLRs), which establish "expected performance levels" for, among other things, how long cardholders should wait, on average, to reach a representative ("average call wait time") and how frequently cardholders should hang up while waiting to reach a customer service representative ("call abandonment rate").

32. Within the call center industry, the call abandonment rate is a metric designed to assess how many callers hang up out of frustration from waiting on hold.

33. Under the SLRs, cardholders are expected to wait no more than 10 minutes to speak with a customer service representative and abandon calls no more than 15% of the time during the disbursement period (the nine days surrounding the release of federal benefit payments). At all other times of the month, cardholders are expected to wait no more than 8 minutes and abandon calls no more than 12% of the time.

FIRST AMENDED
COMPLAINT-CLASS ACTION
CASE NO. 5:25-CV-03318-KK-DTB

34. Comerica's provision of customer service falls far short of these expectations; Direct Express cardholders have often had to wait far longer and have abandoned their calls far more frequently than the SLRs expected them to.

35. For example, in March, April, and May 2022, cardholders waited over an hour, on average, to speak with a customer service representative. During these same months, some cardholders waited for as long as two-and-a-half hours to speak with a customer service representative.

36. Comerica's failure to ensure that its vendors provide timely and effective assistance to Direct Express cardholders interferes with cardholders' ability to protect and access their funds. For example, these failures delay or prevent cardholders from receiving protection from and compensation for unauthorized transfers, and from otherwise accessing their government benefits.

37. Being forced to endure long wait times, or having one's calls repeatedly dropped with no information on when anyone will be available to assist, also wastes cardholders' time. Some cardholders waited anywhere from 30 minutes to 7 hours to speak with a customer service representative and had to call repeatedly, sometimes over the course of months, to get help with unauthorized transfers and replacement cards.

38. Comerica's failure to provide timely and effective assistance to Direct Express cardholders interferes with cardholders' ability to protect and access their funds. For example, these failures delay or prevent cardholders from receiving protection from and compensation for unauthorized transfers, and from otherwise accessing their government benefits.

39. These barriers to protecting and accessing their funds have likely led some cardholders to give up entirely on seeking Regulation E's protections or other assistance.

40. Many Direct Express cardholders are beneficiaries of federal programs for retirees and individuals unable to work due to disability, and thus have little income. Indeed, government benefits are some cardholders' sole source of income. Losing access to these benefits, even temporarily, can leave cardholders unable to pay for housing, utilities, food, and other necessities. The same is true when cardholders' funds are stolen through unauthorized transfers.

41. Direct Express cardholders cannot opt to have another bank administer their Direct Express account. Nor can they choose which vendor Comerica designates to provide them with account services. They have no choice but to use Comerica and the vendors that Comerica chooses.

**B. Plaintiff's Experience**

42. Robert Trusty is a senior citizen residing in Jurupa Valley, California, who receives, as his only source of income, Social Security Retirement and Supplemental Security Income (SSI).

43. From 2020 to July 2025, Mr. Trusty received all of his regular income through the Direct Express debit card.

44. On July 5, 2025, Mr. Trusty attempted to withdraw cash from his Direct Express account but was unable to do so after receiving an ATM message that his PIN was invalid. Mr. Trusty called Direct Express customer service, reset his PIN, and was able to withdraw funds.

45. On July 7, 2025, Mr. Trusty again attempted to use an ATM to withdraw money from his Direct Express account. Yet again, Mr. Trusty's attempts were unsuccessful, and he received messages stating he had used an invalid PIN and that there was an invalid account.

46. Mr. Trusty had no idea why he could not access his account again. From July 7, 2025, to July 12, 2025, he tried to reach Direct Express customer service to

FIRST AMENDED
COMPLAINT-CLASS ACTION
CASE NO. 5:25-CV-03318-KK-DTB

no avail. He called the customer service line multiple times per day and never got through to anyone despite being put on hold for long periods of time.

47. On July 13, 2025, Mr. Trusty finally got through to customer service. He was informed that his account had been suspended by Defendant due to suspicious activity.

48. The customer service representative with whom he spoke listed several recent transactions for Mr. Trusty, including a $681.99 MoneyGram transaction in Dallas, Texas, completed on July 6, 2025, which Mr. Trusty identified as unauthorized. As a result of that unauthorized transaction, Mr. Trusty's account was nearly depleted of funds.

49. The customer service representative told Mr. Trusty that he would initiate a dispute and would mail Mr. Trusty dispute forms and a new card (for a charge) to an address where Mr. Trusty was staying at the time.

50. As a result of the fraudulent transaction and the new card fee, Mr. Trusty's account had a negative balance.

51. Mr. Trusty received the new card but did not receive dispute forms.

52. On August 8, 2025, Mr. Trusty received a denial letter from Defendant dated July 25, 2025, stating it had determined that "no error occurred" and denying his claim.

53. The letter stated:

Our investigation findings included one or more of the following:

- Access to the account during the dispute period appears to be from authorized users and/or the named cardholder;

- The merchant was "Pre-Authorized" to debit the card and the authorization was not revoked;

- Transaction(s) were authorized using information and authentication known only to the cardholder with no signs of compromise; or

FIRST AMENDED
COMPLAINT-CLASS ACTION
CASE NO. 5:25-CV-03318-KK-DTB

- A review of your prior transactions with this or similar merchants and, in some instances, communications with the merchant confirmed the transaction was authorized.

54. The letter did not identify which purported finding(s) Defendant contended applied to Mr. Trusty's dispute. Instead, it was merely a form letter bearing the label "FRD7-DenyConflictingInfo-V01" at the bottom of the letter.

55. During one of Mr. Trusty's calls to Defendant during these stressful events, he finally was able to talk to a Direct Express supervisor. The supervisor told Mr. Trusty that his PIN had been changed on July 4, 2025, before he called and changed it on July 5, 2025. Further, on July 5, 2025, a person gained access to his account through Defendant's mobile application and had changed the account information, including his PIN, phone number, email address, and mailing address. The mailing address was for somewhere in Texas.

56. Mr. Trusty called the dispute department at Direct Express on August 8, 2025. He was informed that four transactions had been included in his dispute rather than the single transaction that Mr. Trusty had identified as fraudulent. He corrected the information. The customer service agent at the dispute department had no knowledge of the unauthorized access to Mr. Trusty's account from Defendant's mobile application. The agent suggested that Mr. Trusty email Defendant again to request further consideration of the dispute. Mr. Trusty also requested that Defendant send him all of the documents that Defendant had relied on in denying his dispute.

57. Mr. Trusty emailed Defendant, as suggested, that same day, on August 8, 2025, identifying the single transaction that he disputed and requesting additional consideration.

FIRST AMENDED
COMPLAINT-CLASS ACTION
CASE NO. 5:25-CV-03318-KK-DTB

58.    On August 14, 2025, Mr. Trusty filed a police report with the Riverside County Sheriff Department, and also, around that date, filed complaints with the Federal Trade Commission, CFPB, and FBI.

59.    Mr. Trusty continued to follow up with Defendant by email.

60.    On August 20, 2025, Mr. Trusty received the documents he had requested from Defendant. The package included a cover page regarding Mr. Trusty's "Service Request" that indicated a "Substatus" of "Denied-Conflicting Info." The cover page also incorrectly stated that the total disputed amount was $849.99. The documents included blank dispute forms that had been mailed to a Livingston, Texas address unknown to Mr. Trusty.

61.    The documents contained no information regarding why Defendant itself suspended Mr. Trusty's account for suspicious activity after the fraudulent transaction, nor did they note any information regarding the unauthorized access to Mr. Trusty's account from Defendant's mobile application resulting in the account information being changed.

62.    On September 12, 2025, Defendant mailed Mr. Trusty another letter denying his request for further consideration of the fraudulent transaction. The letter still erroneously stated that $849.99 was in dispute and again provided no information actually relating to Mr. Trusty's dispute or Defendant's purported investigation thereof. It was merely another form letter bearing the label "FRD30-DENYSECONDREVIEW-V01."

63.    To this day, Defendant has not credited the stolen funds to Mr. Trusty's account.

64.    Mr. Trusty wasted more than 20 hours on the phone over dozens of calls to Defendant trying to report the fraud, providing information to support the dispute, and then addressing Defendant's shoddy "investigation."

65.     Mr. Trusty's Direct Express account was suspended and the funds were stolen while he was traveling outside of California. Without access to his funds, and with no timely credit provided by Defendant, Mr. Trusty could not afford to travel home to California where he was scheduled to receive critical medical treatment. Mr. Trusty was only able to return home and receive medical care after he received his August 2025 Social Security funds through a different means. He suffered anxiety, humiliation, and stress as a result of Defendant's conduct.

66.     Despite its obligation under the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693, *et seq*., to promptly credit Mr. Trusty's account, and its contractual promises that he would not lose money or would lose only a small amount if he promptly reported the fraud, Defendant refused to credit the amount of the stolen funds.

67.     Mr. Trusty would like to continue to receive his Social Security and SSI payments on the Direct Express card if Defendant (or its successors) begin upholding its promises under the Terms of Use and obligations under federal law as to fraudulent transfers.

## V.     CLASS ACTION ALLEGATIONS

68.     **Statutory Reference** (L.R. 23-2.1). Mr. Trusty brings this case as a proposed class action under Federal Rule of Civil Procedure 23(b)(3).

69.     **Definition of the Proposed Class and Sub-Classes** (L.R. 23-2.2(a)):

**Fraudulent Transfers Class**: All persons issued a Direct Express Debit Mastercard® who (1) notified Defendant that one or more charges on their account were unauthorized or disputed; and (2) were denied reimbursement due to "Conflicting Info," through the date of any class certification order in this action.

**EFTA Sub-Class**: All persons in the Fraudulent Transfers Class who (1) were denied on or after December 9, 2024, through the date of any class certification order in this action and (2) whose denial was with regard to a disputed charge (or charges) totaling more than $50.

**California Sub-Class:** All California residents in the Fraudulent Transfers Class.

70. Plaintiff reserves the right to amend or modify the proposed Class and Sub-Class definitions or add other proposed subclasses based on information obtained after the filing of this Complaint.

71. **Class Size** (L.R. 23-2.2(b)). **Numerosity** under Federal Rule 23(a)(1) is satisfied.

72. Approximately 3.4 million Americans receive payments on Direct Express Cards.[3]

73. Approximately 357,000 Californians receive payments on Direct Express Cards.[4]

74. Unauthorized charges resulting from theft, loss of cards, and fraud are common.

75. If Defendant's standard practices for investigating and denying reimbursement of funds to fraud victims impacted only 0.5% of cardholders, then the Fraudulent Transfers Class would include an estimated 17,000 people (3,400,000 x .005 = 17,000) and the California Sub-Class would include an estimated 1,785 people (357,000 x .005 = 1,785).

76. The Fraudulent Transfers Class is likely much larger, however. The CFPB found that, between April 2, 2019, and December 6, 2024, upon completing investigations of notices of error, Defendant sent notices to consumers that were

---

[3] *See* BNY, BNY to Mange U.S. Department of the Treasury's Largest Prepaid Debit Card Program for Federal Benefits – Direct Express (Nov. 21, 2024) https://www.bny.com/corporate/global/en/about-us/newsroom/press-release/bny-to-manage-us-department-of-the-treasurypercent27s-largest-pr-130414.html.

[4] *See* Direct Express, The Demographics of Direct Express, https://directexpress.info/2025/12/23/the-demographics-of-direct-express-2/ (last visited March 17, 2026).

FIRST AMENDED
COMPLAINT-CLASS ACTION
CASE NO. 5:25-CV-03318-KK-DTB

vague and failed to provide an explanation of its findings related to the claim in more than 220,000 instances.

77. The Fraudulent Transfers Class, EFTA Sub-Class, and California Sub-Class all have at least hundreds of members. As a result, the Class is sufficiently numerous that joinder of all members is impracticable.

78. The number of Class members, their identities, and their contact information can be found in Defendant's records.

79. **Commonality** (L.R. 23-2.2(d)). There are **questions of law and fact common** to the Class members under Rule 23(a)(2), including:

a) Whether Defendant has a standardized practice of denying reimbursement for transactions disputed by consumers unless the consumer establishes the transactions were not authorized;

b) Whether Defendant's denial of disputes for "conflicting info" is unlawful under the EFTA;

c) Whether Defendant's investigations of disputed transactions are inadequate, unreasonable, or unfair;

d) Whether Defendant's customer service practices are inadequate to fulfill its contractual obligations and/or unfair;

e) Whether Defendant's letters denying disputes sent to Plaintiff and the Class members breach its contractual obligations to explain why it determined an error did not occur; and

f) The remedies available to Plaintiff and the Class.

80. **Typicality** (L.R. 23-2.2(e)). Mr. Trusty's claims are **typical** of the proposed Class members' claims under Rule 23(a)(3). Mr. Trusty disputed an unauthorized transaction and Defendant denied his claim for reimbursement of the disputed transaction on the grounds that Defendant found conflicting information during its investigation.

81.     **Adequacy** (L.R. 23-2.2(c)). Mr. Trusty is an **adequate** class representative under Rule 23(a)(3) because he will fairly and adequately represent the interests of the Class members. He has no interests that conflict with interests of other Class members. He has retained counsel who are experienced trial lawyers, have prosecuted many consumer class actions, and have the resources to vigorously prosecute the action.

82.     **Predominance** (L.R. 23-2.2(f)). The common questions outlined above **predominate** over any individual issues under Rule 23(b)(3).

83.     **Superiority** (Local Rule 23-2.2(f)). A class action is **superior** to individual actions under Rule 23(b)(3) because the damages suffered by each Class member are likely to be relatively small and, absent class litigation, many members of the proposed Class and Sub-Classes would likely receive no relief at all. This is especially true in this case, where Class members are living on fixed incomes and are unlikely to have the resources necessary to bring individual claims against a large corporate defendant such as Comerica. Certifying the Class and Sub-Classes will also avoid thousands of repetitive lawsuits, conserving judicial resources and promoting consistency and efficiency of adjudication. Concentrating the litigation in this District is also appropriate since Class members receive federal benefits and California is the state with the most active Direct Express cardholders.[5] Lastly, there are no substantive manageability issues in litigating these claims as a class action as the case can be tried almost entirely using class-wide proof of Defendant's conduct and records.

84.     The Class's claims for injunctive relief can be certified under Federal Rule of Civil Procedure 23(b)(2) because Defendant acted and continues to act on

---

[5] *See* Direct Express, The Demographics of Direct Express, https://directexpress.info/2025/12/23/the-demographics-of-direct-express-2/ (last visited March 16, 2026).

grounds generally applicable to the Class such that declaratory and injunctive relief with respect to the Class and Sub-Classes as a whole is appropriate.

85.    **Nature of the Notice to the Proposed Class** (Local Rule 23-2.2(g)). Defendant maintains a mailing address for each Direct Express cardholder and email addresses for most of them.

86.    Direct notice can be provided to the Class via United States mail and email. *See* Fed. R. Civ. P. 23(c)(2)(B). These notices would be supplemented by a website. *Id.*

## VI.    CLAIMS

**FIRST CAUSE OF ACTION**

**Violations of Electronic Funds Transfer Act,**

**15 U.S.C. §§ 1693g(a), (b), and 1693f**

**(On behalf of the EFTA Sub-Class)**

87.    Mr. Trusty incorporates by reference all preceding allegations.

88.    Defendant's Direct Express Cards are access devices within the meaning of the EFTA and Regulation E. 12 C.F.R. § 205.2(a).

89.    The EFTA and Regulation E place sharp limitations on consumer liability for unauthorized transactions. *See* 15 U.S.C. § 1693g ("Consumer liability"); 12 C.F.R. § 1005.6 ("Liability of consumer for unauthorized transfers").

90.    The EFTA requires that financial institutions limit consumer liability for unauthorized electronic funds transfers to $50 if the consumer notifies the bank within two business days after learning of the loss or theft of an access device such as a prepaid debit card. 12 C.F.R. § 205.6(b)(1).

91.    Under Regulation E, where a financial institution completes an investigation following a notice of error and determines that no error occurred or a different error occurred from that described by the consumer, it must provide additional information to the consumer. 12 C.F.R. § 1005.11(d). In particular, the

financial institution must provide a written explanation of its findings and shall note the consumer's right to request the documents that the institution relied on in making its determination. *Id*. § 1005.11(d)(1).

92.    Defendant sent Mr. Trusty and members of the EFTA Sub-Class letters denying disputed claims that failed to include the written explanation required under Regulation E.

93.    Specifically, Defendant sent Mr. Trusty a form letter labeled "conflicting info" that did not include sufficient explanation of its findings related to the claim. Instead, Defendant listed several circumstances that could cause a claim to be denied, without identifying which circumstance(s) caused it to deny Mr. Trusty's claim.

94.    Further, under Section 1693g(b), Defendant must show that the disputed transfer was authorized:

> BURDEN OF PROOF.--In any action which involves a consumer's liability for an unauthorized electronic fund transfer, the burden of proof is upon the financial institution to show that the electronic fund transfer was authorized or, if the electronic fund transfer was unauthorized, then the burden of proof is upon the financial institution to establish that the conditions of liability set forth in subsection (a) have been met, and, if the transfer was initiated after the effective date of section 905, that the disclosures required to be made to the consumer under section 905(a)(1) and (2) were in fact made in accordance with such section.

95.    As a Federal Reserve Board Examiner has explained, "When the alleged error is an unauthorized EFT, the EFTA places the burden of proof on the financial institution to establish the transaction was authorized. Therefore, if the

FIRST AMENDED
COMPLAINT-CLASS ACTION
CASE NO. 5:25-CV-03318-KK-DTB

institution cannot establish the disputed EFT transaction was authorized, the institution must credit the consumer's account."[6]

96. Defendant's inadequate investigations failed to meet this burden as to Mr. Trusty's dispute and the disputes of members of the EFTA Sub-Class. The form denial letter and "Service Request" detail sheet reveal that Defendant denied Mr. Trusty's claim because it found "conflicting information," not because it conducted an investigation sufficient to establish that the transaction was authorized. Defendant's conduct impermissibly shifted the burden to Mr. Trusty and members of the EFTA Sub-Class to show that the transactions were unauthorized.

97. Defendant's acts and omissions as set forth above violate the EFTA.

98. As a direct and proximate result of Defendant's violations of the EFTA, Mr. Trusty and members of the EFTA Sub-Class are entitled to an award of statutory and actual damages as well as attorneys' fees and costs.

99. Defendant's inadequate investigations and impermissible shifting of the burden of proof onto the consumer, contrary to the requirements of the statute, constitute violations of Section 1693f(e), entitling Mr. Trusty and all EFTA Sub-Class members to treble damages.

## SECOND CAUSE OF ACTION

### Breach of Contract

### (On behalf of the Fraudulent Transfers Class and the California Sub-Class)

---

[6] Scott Sonbuchner, *Error Resolution and Liability Limitations Under Regulations E and Z: Regulatory Requirements, Common Violations, and Sound Practices*, Consumer Compliance Outlook (2021), *available at* https://www.consumercomplianceoutlook.org/2021/second-issue/error-resolution-and-liability-limitations-under-regulations-e-and-z/. *See also*, *Exarhos v. JPMorgan Chase Bank, N.A.*, 2021 U.S. Dist. LEXIS 135292, at *5-6 (N.D. Ill. July 20, 2021); *Acafrao v. United States Century Bank*, 2010 U.S. Dist. LEXIS 162849, at *22 (S.D. Fla. Aug. 9, 2010); *Brown v. Bank of Am., N.A.*, 2022 U.S. Dist. LEXIS 108749, at *4 (D. Md. June 17, 2022).

100. Mr. Trusty incorporates by reference all preceding allegations.

101. The Direct Express Terms of Use is an enforceable contract between Mr. Trusty and Class members and Defendant.

102. The Terms of Use is a form contract of adhesion drafted by Defendant and presented to Mr. Trusty and the Class members with no opportunity for negotiation.

103. Defendant's Terms of Use provide that the funds in customers' accounts "are deemed held in the State of Michigan" and that "[u]nless a federal law or regulation applies to a specific section of these Terms or use of the Card, these Terms will be governed by and interpreted in accordance with the laws of the State of Michigan."

104. In the Terms of Use, Defendant instructs customers to "tell us AT ONCE if you believe your Card or PIN has been lost or stolen" and promises that "[i]f you tell us within two (2) Business Days, you can lose no more than $50 if someone used your Card or PIN without your permission." The Terms of Use further state that if a cardmember does not report within "two (2) Business Days after you learn of the loss or theft of your Card or PIN, and we can prove that we could have stopped someone from using your Card or PIN without your permission if you had told us, you could lose as much as $500."

105. And for California residents, such as Mr. Trusty, Defendant promises that "you will not be liable for the $500 amount described above in any event."

106. Defendant also promises that it "will tell you the results of our investigation within three Business Days after completing our investigation" and "[i]f we decide that there was no error, we will send you a written explanation."

107. The Terms of Use provide that Defendant "will determine whether an error occurred with 10 Business Days after we hear from you and we will correct any error promptly." Defendant promises that if it takes longer than 10 days to

FIRST AMENDED
COMPLAINT-CLASS ACTION
CASE NO. 5:25-cv-03318-KK-DTB

investigate an error on a cardholder's account, it will credit the cardholder's account while investigating the error.

108. Together, these promises provide Mr. Trusty and the Class members with the right to (i) a means to timely report unauthorized transactions to Defendant and provide information to dispute those transactions; (ii) a reasonable investigation of any reported errors or unauthorized charges; (iii) reimbursement for charges that Defendant determined were unauthorized after a reasonable investigation in good faith; and (iv) a written explanation from Defendant for any denied claims.

109. Defendant breached the contract to Mr. Trusty and the Class members by failing to send a written explanation that explained why Defendant "decide[d] that there was no error." Instead of abiding by its promise to do so, Defendant's denial letters informed Mr. Trusty and other cardholders that their claims were being denied based on "one or more" of a list of circumstances, without actually identifying which of the circumstances it had purportedly determined applied to the cardholder's dispute.

110. By listing a series of disparate possible reasons for denial, Defendant never explained to Mr. Trusty and the Class members in writing why their disputes were denied.

111. Per the Terms of Use, Defendant is responsible for conducting the investigation into a cardholder's report of error and is vested with the discretion to (i) provide adequate customer service; (ii) conduct reasonable investigations; and (iii) "determine whether an error occurred."

112. The implied promise of good faith and fair dealing in the Terms of Use required Defendant to (i) make adequate customer service available to Mr. Trusty and the Class members so that they can timely report claims and provide information to limit their liability for unauthorized transactions; (ii) conduct reasonable

FIRST AMENDED
COMPLAINT-CLASS ACTION
CASE NO. 5:25-CV-03318-KK-DTB

investigations in good faith; and (iii) come to determinations in good faith regarding disputes.

113.    Defendant breached the implied promise of good faith and fair dealing in the Terms of Use by failing to (i) make adequate customer service available for consumers to promptly report unauthorized transactions and provide information regarding disputes; (ii) conduct reasonable investigations of disputes in good faith; and (iii) make determinations in good faith when denying claims.

114.    Defendant exercised discretion in all three of these failings:

    i.   Defendant exercised its discretion in deciding to inadequately staff its customer service line such that cardholders often could not dispute errors within the timeframes necessary for them to be able to limit their liability, or to provide information to Defendant during its investigation.

    ii.   Defendant exercised its discretion in investigating cardholder disputes in a manner that was inadequate and incompetent.

    iii.   Defendant exercised its discretion in "decid[ing] that there was no error" when disputed charges were clearly unauthorized.

115.    Defendant's lack of good faith is evidenced by the facts alleged herein. No person requiring consumers to report unauthorized transactions "AT ONCE" should subject consumers to unreasonable hold times when they call in to report such fraud. Comerica's inadequate customer service has impeded Direct Express cardholders' efforts to dispute unauthorized transfers and bookkeeping errors and to seek liability protection from unauthorized transfers as provided in Regulation E.

116.    Further, no person conducting a comprehensive investigation of the facts could conclude in good faith that the facts did not reasonably support Mr. Trusty's claim of unauthorized use.

FIRST AMENDED
COMPLAINT-CLASS ACTION
CASE NO. 5:25-CV-03318-KK-DTB

117. Lastly, no person that had reached reasonable conclusions regarding Mr. Trusty's claim would deny the claim on a form letter that failed to include any explanation of the conclusions causing the denial.

118. Defendant's conduct denied Mr. Trusty and the Class members of benefits to which they were entitled under the Terms of Use.

119. As a result of Defendant's breaches, Defendant wrongly failed to reimburse Direct Express cardholders for unauthorized transactions, thereby damaging Mr. Trusty and the Class members in the amount of the sums not credited back to their accounts beyond $50, for those who notified Defendant within two days of discovering the loss or theft, or $500, for those who notified Defendant of the loss or theft more than two days after discovering the loss or theft.

120. Mr. Trusty and members of the California Sub-Class were further harmed in the amount of the sums not credited back to their accounts beyond $500 after they notified Defendant of the loss or theft of their card or PIN—regardless of when the cardholder made the report—as Defendant promised specifically to California residents.

121. As a further result of Defendant's breaches, Mr. Trusty and the Class members were harmed by wasting their time through (i) the time they spent enduring unreasonable hold times and (ii) the time they spent reporting claims for errors and unauthorized transactions that were not handled by Defendant in good faith.

122. As a direct and proximate result of Defendant's breach, Mr. Trusty and members of the Fraudulent Transfers Class and California Sub-Class are entitled to an award of nominal and actual damages.

## THIRD CAUSE OF ACTION

**Unlawful Business Practices in Violation of California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.**

**(On behalf of the California Sub-Class)**

FIRST AMENDED
COMPLAINT-CLASS ACTION
CASE NO. 5:25-CV-03318-KK-DTB

123. Mr. Trusty incorporates by reference all preceding allegations.

124. California's Unfair Competition Law (UCL) prohibits any "unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200, *et seq.*

125. Comerica's failure to provide Direct Express cardholders with timely and efficient assistance with their accounts has caused or was likely to cause substantial injury to cardholders.

126. The main way that Direct Express cardholders obtain account services is by calling Comerica's customer service line and speaking with a customer service representative. Comerica encourages cardholders to rely on its customer service phone lines for virtually all account services. It advertises the phone line as the best option for getting help, will only accept notices of error or requests to stop preauthorized payments through the phone line or mail, and offers very few services through its Direct Express website or app.

127. Cardholders have had to wait long periods of time, or have had their calls repeatedly dropped, when calling to report unauthorized transactions on their accounts, receive liability protection from such transactions, or obtain help with other account problems that prevent them from accessing their essential government benefits. Comerica's failures have also wasted cardholders' time and likely have led some cardholders to give up on seeking assistance at all.

128. Defendant has also acted unfairly by conducting shoddy investigations into cardholder disputes, which enables Defendant to deny more claims than it would if it were to conduct reasonable investigations.

129. Defendant further acts unfairly by failing to provide information to cardholders about the reasons it has denied their disputes. Such information would allow cardholders that have had fraud disputes wrongly denied to provide further information to Defendant so that they may rightfully be reimbursed.

130. These acts or practices are unfair. The injuries to Direct Express cardholders are not outweighed by any benefit to consumers or competition. Consumers do not benefit from being denied timely and efficient assistance, from interference with their ability to protect and access their funds, or from having shoddy investigations conducted into their disputes.

131. Mr. Trusty, individually and on behalf of the California Sub-Class and all members of the general public who are, have been, or may be subjected to Defendant's unfair business acts and practices, is entitled to declaratory and injunctive relief prohibiting such practices in the future.

132. Cardholders do not get to choose the financial institution that administers the Direct Express program. Because consumers who receive payments through Direct Express cannot choose a different prepaid debit card program, they are likely to be injured by Defendant's (or its successor's) conduct in the future.

133. Mr. Trusty and the California Sub-Class seek injunctive relief correcting these practices and may recover reasonable attorneys' fees, costs, and expenses incurred in bringing this action under California Code of Civil Procedure § 1021.5.

## VII. PRAYER FOR RELIEF

Mr. Trusty seeks judgment in his favor and damages against Defendant, and:

A. An order certifying this case as a class action under Federal Rule of Civil Procedure 23, appointing Mr. Trusty as Class Representative and his attorneys as Class Counsel;

B. An award of all damages to which Mr. Trusty and the Class are entitled including actual damages, treble damages, statutory damages, and nominal damages;

C. Prejudgment interest;

D. An award of attorneys' fees and costs; and

E. Injunctive relief precluding Defendant from continuing to engage in the

acts or practices described throughout this complaint when handling disputes received from Direct Express cardholders.

## VIII. DEMAND FOR JURY TRIAL

Mr. Trusty demands a trial by jury on all claims so triable.

RESPECTFULLY SUBMITTED AND DATED this 18th day of March, 2026.

By: */s/ Sophia M. Rios*

Sophia M. Rios, SBN 305801
srios@bergermontague.com
BERGER MONTAGUE PC
8241 La Mesa Blvd., Suite A
La Mesa, CA 91942
Telephone: (619) 489-0300

Marika K. O'Connor Grant, SBN 334469
moconnorgrant@bergermontague.com
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: (612) 268-0311

Beth E. Terrell, SBN 178181
Blythe H. Chander, *pro hac vice*
TERRELL MARSHALL
LAW GROUP PLLC
1700 Westlake Avenue North, Suite 300
Seattle, WA 98109
Tel: (206) 816-6603
bterrell@terrellmarshall.com
bchandler@terrellmarshall.com

Matthew M. Loker (SBN 279939)
LOKER LAW, APC
132 Bridge Street
Arroyo Grande, CA 93420

FIRST AMENDED
COMPLAINT-CLASS ACTION
CASE NO. 5:25-cv-03318-KK-DTB

Tel: (805) 468-8181
matt.loker@loker.law

*Attorneys for Plaintiff and the Proposed Class Members*

FIRST AMENDED
COMPLAINT-CLASS ACTION
CASE NO. 5:25-CV-03318-KK-DTB